UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **DERRICK ROBERT STRAUSS,** | ) | Case No. 12-14162-HRT |
| | ) | |
| Debtor. | ) | Chapter 7 |
| | ) | |
| | ) | |
| **GLEN R. ANSTINE, Chapter 7 Trustee,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Adversary No. 12-01801 HRT |
| v. | ) | |
| | ) | |
| **BARCLAYS BANK DELAWARE,** | ) | |
| dba BARCLAYCARD US, | ) | |
| | | |
| Defendant. | | |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on the cross motions for summary judgment filed by the plaintiff, Glenn Anstine, Chapter 7 Trustee ("Trustee") and defendant, Barclays Bank Delaware (the "Bank") on October 14, 2014 (docket #25 and #26), the supporting document filed by the Bank on October 16, 2014 (docket #27), the responses filed by both parties on October 31, 2014 (docket #31 and #32) and the replies in support thereof filed by both parties on November 20, 2014 (docket #37 and #38). The Court has reviewed the pleadings and the record and is now ready to rule.

I. Background

The Debtor filed his individual Chapter 7 petition on March 8, 2012. The Debtor's spouse ("Mrs. Strauss"), did not join the bankruptcy case or file separately. Before the petition date, the Debtor and Mrs. Strauss each had a credit card with the Bank. The cards had different account numbers, but the Bank sent one monthly statement to the couple that included all charges from both cards, with a combined balance due. In the two years prior to the petition date, the entirety of the household income was derived from the Debtor's business. Mrs. Strauss

1

did not work at a job that generated any income. Debtor's tax returns show that she was working as a homemaker during this period, and that the couple has three dependent children.

On December 26, 2012, Trustee filed an adversary complaint against the Bank, seeking recovery of pre-petition payments made to the Bank towards the combined credit card balance. The payments to the Bank were made from bank accounts held jointly by the Debtor and Mrs. Strauss. The supporting document filed by the Bank contains all the credit card statements for the two-year pre-petition period, as well as the affidavit of a Bank employee attesting that the statements are true and correct copies.

Discovery proceeded, and trial was set for January 26, 2015, but on December 29, 2014, the parties jointly moved to vacate the trial and requested the Court to determine the motions for summary judgment. At a status conference held on January 13, 2015, the Court granted that request. The Debtor's bankruptcy estate has been fully administered, and he received a discharge on March 18, 2013.

II. Discussion

Trustee asserts five claims in his complaint: 1) Avoidance of Transfer under §§ 547 and 550 (90 day Transfers); 2) Avoidance of Transfer under §§ 547 and 550 (One Year Transfers); 3) Avoidance of Transfer under § 548(a)(1)(A); 4) Avoidance of Transfer under § 548(a)(1)(B); and 5) Disallowance under § 502. Trustee withdrew his second claim in his Response (docket #31), conceding to the Bank's argument that § 547(b)(4)(B), which applies to transfers beyond 90 days, could not apply to the Bank, as the Bank was not an insider.

As a preliminary matter, the Bank argues that the Trustee's recovery is limited to the $15,000 in damages specifically alleged in the complaint, as the Trustee never sought to amend the complaint (other than to amend a party name at docket #6). In the first claim for relief, Trustee states, "Within the 90 days preceding the Petition Date, the Debtor made the 90-day Transfers to Barclay which totaled no less than $15,000." Other than in the second claim for relief, which the Trustee has now withdrawn, there is no mention of any dollar figure in the remainder of the complaint. The Bank notes that "in correspondence with Barclay's counsel, the Trustee has indicated that he intends to seek recovery of transfers dating back at least two years that total far more than the $15,000 in transfers identified in the complaint." The Trustee responds that the complaint clearly sought avoidance of transfers within two years of the petition date "which totaled no less than $15,000," which means that "the Trustee's complaint specifically asserts that *all* transfers from the Debtor to the Defendant within the two years prior to the Petition Date are at issue in the complaint." In the Trustee's motion for summary judgment, he provides a "Calculation of Damages" of $11,231.55 for payments made in the 90 days pre-petition, and $86,916.52 for payments made in the two years pre-petition.

The Court must decide this matter with the complaint it has of record, and not based on what the plaintiff may or may not seek to amend in the future. The deadline to amend the complaint was August 1, 2014, as stated in the scheduling order (docket #22). The Court agrees

with the Bank that the Trustee should have amended the complaint to include, with more specificity, the dates and amounts of the transfers at issue during the two-year period. However, as evidenced by the analysis below, that issue is not dispositive, and the Court will consider the remaining arguments on the merits.

Summary judgment is appropriate when the materials submitted to the court demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989); *National Dev. Servs., Inc. v. Denbleyker (In re Denbleyker)*, 251 B.R. 891, 894 (Bankr. D. Colo. 2000). *See also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). What facts are material depends upon the substantive law applied. *Kaiser-Francis Oil Co.*, 870 F.2d at 565. Disputes about immaterial facts will not preclude summary judgment. *Id.* Cross motions for summary judgment raise an inference that summary judgment will be appropriate; however, the Court must nevertheless determine whether plaintiff or defendant independently satisfies the requirements for summary judgment. *In re Harris*, 209 B.R. 990 (10th Cir. BAP 1997).

    A. First Claim for Relief (90-day transfers under § 547)

To prevail on his first claim for relief, the Trustee must prove that the Debtor transferred an interest of the Debtor in property:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
> (A) on or within 90 days before the date of the filing of the petition; or
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Even if the Court assumes the Trustee has made a prima facie case on all the applicable elements of this section for purposes of the Trustee's summary judgment motion, the Court can

grant the Bank summary judgment on this claim if the Bank successfully shows a defense under §547(c)(2), which provides a transfer is not avoidable if "such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was (a) made in the ordinary course of business of the debtor and transferee, or (b) made according to "ordinary business terms" (the ordinary course defense). *See In re M&L Bus. Mach. Co., Inc.*, 155 B.R. 531, 534 (Bankr. D. Colo. 1993); *In re Khera*, 2008 WL 5157769 (Bankr. D. N.M. 2008) (granting summary judgment to defendant bank under ordinary course defense).

At the outset, the Court notes that the amount sought by the Trustee for payments during the 90-day preference period has varied. As noted previously, in the complaint, the Trustee identified the amount as not less than $15,000. In the Trustee's affidavit attached to his summary judgment motion, the Trustee stated that figure as $11,231.55. In his response at docket #31, he specifically described the payments as $10,000 on January 5, 2012, $1,000 on January 31, 2012, and $231.55 on February 22, 2012, but in his calculation of damages, he estimated damages in the amount of $3,995.03 for payments made in the 90 days prior to the petition date, apparently recognizing the Bank's new value defense, which will be discussed below.[1]

Turning to the elements of § 547, the Trustee has shown that the Debtor transferred an interest in property (1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the Debtor before such transfer was made; (3) made while the Debtor was insolvent;[2] (4) made on or within 90 days pre-petition. The Bank is an unsecured creditor; thus, it would have received less than the amount of the transfer in a liquidation. *See Adam Aircraft Indus., Inc.*, 493 B.R. 834, 848 (Bankr. D. Colo. 2013).

The question then becomes whether the Bank can satisfy the elements of the ordinary course defense under section 547(c)(2), which permits a "safe harbor" for a transfer of a preferential payment if the transfer was made in the ordinary course of business between the parties and made according to "ordinary business terms." *In re American Home Mortgage Holdings, Inc.*, 476 B.R. 124, 135 (Bankr. D. Del. 2012). "Courts generally are interested in whether the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace or, on the other hand, whether it was incurred as an insider arrangement with a

---

[1] The Debtor made $7,236.52 in charges after the $10,000 payment on January 4, 2012. Subtracting those charges from the three payments made in the preference period results in the amount remaining of $3,995.03.

[2] The Bank asserts there was no indication, to the Bank, before filing of the petition that Debtor was insolvent. For purposes of this claim for relief, however, the Court will assume the Debtor was insolvent, as reflected in his statement of financial affairs and schedules. *See* § 547(f) (presumption of insolvency arises in the 90-day pre-petition period).

closely held entity." 5 *Collier on Bankruptcy* ¶ 547.04[2][a][i], at 547-51 (16th ed. 2013). There is no dispute here that the Bank is not an insider of the Debtor.

Only a transaction that is so unusual or uncommon "as to render it an aberration in the relevant industry" falls outside the broad range of terms encompassed by the meaning of 'ordinary business terms.'" *In re Jan Weilert RV, Inc.*, 315 F.3d 1192, 1198 (9th Cir. 2003) (citations omitted). "[T]he court must look to those terms employed by similarly situated debtors and creditors facing the same or similar problems. If the terms in question are ordinary for industry participants under financial distress, then that is ordinary for the industry." *Id.* at 1197. "[C]reditors are not required to prove a particular uniform set of business terms, rather 'ordinary business terms' refers to the broad range of terms that encompasses the practices employed by those debtors and creditors, including terms that are ordinary to those under financial distress." *Id.* at 1198. "Precise data is not necessary to prove ordinary business terms within the creditor's industry. The evidentiary standard . . . is an accommodating one." *In re American Home Mortgage*, 476 B.R. at 141. Thus, proving ordinary business terms "should not pose a particularly high burden for creditors." *In re Healthcentral.com*, 504 F.3d 775, 791 (9th Cir. 2007).

As part of its Supporting Document filed at docket #27, The Bank includes studies done by the AARP and TransUnion showing the ordinary course of business typically conducted within the credit card industry. The studies both state it is very common (82% to 90%) for credit card holders to regularly pay either the full amount due or amounts between the minimum amount due and the full amount due. The Trustee disputes these studies, either as being "expert opinions" or not relevant. The Court notes that, as to ordinary business practices, the Bank need only show that the practices between the parties "were not particularly unusual" departures from what "others do." *In re American Home Mortgage,* 476 B.R. at 141. The inquiry is a broad one, and a creditor is not required to prove "rigorous definitions of either the industry or the credit standards within that industry." *Id.* The Court agrees with the Bank's observation in its motion for summary judgment that a certain percentage of credit card holders do pay off their credit card balance every month, in an effort to avoid paying high interest charges (Docket #26, page 18), and concludes that the transactions at issue fall within the ordinary business terms of the credit card industry.

Additionally, the Bank notes that, as between the Bank and the Debtor, the payments in question were ordinary in relation to past practices. The evidence submitted in the Bank's supporting document clearly shows that in the two years prior to filing bankruptcy, the Debtor normally paid the full credit card balance due for both cards. In most cases those payments were rounded up to even figures in the range of $6,000 per month. The credit cards were Frontier Airlines rewards cards, and the couple apparently put most of their household expenses on those cards in order to earn airline miles. There are only two instances where the couple did not pay off the balance every month, and both times, they "caught up" by making a double payment the next month. For instance, the $14,000 total payment reflected in the August 2010 statement covers a payment missed the previous statement cycle. The $14,000 total payment consisted of $1,000 paid on June 7, $5,000 paid on June 8, and $7,000 paid on June 30. (Docket #27, page

44). This occurred again as reflected in the March 2011 statement, where the $10,000 payment covers a payment cycle missed the month prior. (Docket #27, pages 80, 89).

Thus, the Trustee's assertion that "Debtor made his largest single payment of $10,000 in the two years before the petition date during the 90-day preference window" is simply incorrect. The February 1, 2012, statement (docket #27, page 163) shows a payment of $5,000 on December 7, 2011 (outside the 90-day preference period), and a $10,000 payment on January 4, 2012. This was consistent with the couple's payment practices on the two occasions previously when they had missed a prior month's payment. The subsequent statements showed that, for the first time, the couple's outstanding balance was exceeding their ability to pay it off, with only a $1,000 payment made towards the $6,750 outstanding balance reflected on the March 2012 statement. The total balance by the May 1, 2012, statement, was $10,741, with the couple only having made a payment of $231 in February and $300 in April.

In a remarkably similar case, also brought by a trustee against the Bank, the court found that credit card payments made within 90 days of the petition date were made in the ordinary course of business. *In re Carter*, 506 B.R. 83 (Bankr. D. Ariz. 2014). The court noted that the debtors had a long history of paying off their credit card balance in full, and there were eleven instances, over a two year period, when they had paid more than the account balance indicated on the credit card statement to account for charges made after the statement was prepared. The court held:

> Based on the undisputed facts, the Court finds and concludes that there is no material fact dispute that all of the payments during the preference period were made in the ordinary course of business pursuant to § 547(c)(2). The payments were all made when due except for one, and it was only three days late. The payments were for the full balance due, or close to it, and often covered charges that had been incurred after the statement date and prior to the payment. Such payments of the full balance due, or close to it, were entirely consistent with the Debtor's previous ordinary course of business with the Barclays credit card. They are also consistent with the ordinary course of business in the credit card industry.

*Id.* at 85.

Following the reasoning of that court when presented with almost identical facts, this Court finds that the payments made during the 90- day preference period were made in the ordinary course of business.[3] The Court also finds no evidence, and the Trustee has not argued, that the Bank took any extraordinary collection action within the 90 day pre-petition period. The Court will therefore grant summary judgment to the Bank on the Trustee's first claim for relief.

---

[3] Even if the Court were to find the payments were not made in the ordinary course of business, the Trustee recognizes, and the Court agrees, that the Bank has a new value defense as to all but $3,995 of the charges during the 90-day period. *See In re Carter* at 87.

B. Third[4] and fourth claims for relief (Avoidance of Transfer under § 548(a)(1)(A) and 548(a)(1)(B).

To prevail on these claims under § 548, the Trustee must show that the transfers were made within two years before the Petition Date and that the Debtor voluntarily or involuntarily:

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>
> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548.

The Court initially recognizes the Bank's argument that "the Trustee can assert either a preference claim or a fraudulent transfer claim in this case, but not both." In other words, for the Trustee's fraudulent transfer claim, the Bank must not have been a creditor of the Debtor (he has to use his money to pay his spouse's debts, not his own debts), and for the preference claim, the Bank must have been a creditor of the Debtor. The Court agrees in principle with this argument but finds that in the instant case, as it has already granted summary judgment in the Bank's favor on the preference claim, it is now obliged to consider, in the alternative, the Trustee's fraudulent transfer claim.

---

[4] As previously noted, the Trustee has withdrawn his second claim for relief.

7

The Bank first argues that the Trustee has no evidence of insolvency at the time Debtor made the transfers outside the 90-day pre-petition period,[5] noting that "the longer the time between the transfer and the bankruptcy filing, the less probative the schedules and statements of financial affairs become." *In re Mendez*, 2008 WL 597280, at *12 (Bankr. E.D. Cal. Feb. 29, 2008). Thus, the snapshot that is presented by a debtor of his financial situation on the petition date is not necessarily indicative of his financial situation any time before the petition date.

The Trustee responds that at the very least, the issue of insolvency is one for trial. However, the burden is on the Trustee to show insolvency, and "the allegation that 'at the time of the transfer the Debtor was insolvent or became insolvent shortly after the transfer was made' is insufficient to serve as a basis for finding that the insolvency element of § 547(b) has been satisfied." *In re Logan*, 2014 WL 2506147 (Bankr. N.D. Ohio 2014).

The issue of insolvency normally may be one for trial, but in this instance, with the parties both moving for summary judgment, the Court will assume for this analysis that Debtor was insolvent during the two-year pre-petition period. The Trustee has not identified specifically the transfers in the two-year pre-petition period it considers to be fraudulent. Instead, the Trustee seeks recovery of all payments Debtor made to the Bank during that period "on account of obligations of Mrs. Strauss." The Trustee identifies the total amount of these payments as $86,916.52, the total charges on Mrs. Strauss's individual credit card during that period.

The crux of the Trustee's argument is that "Mrs. Strauss is liable for her charges on [her] account. As such, the Debtor's payments to the Bank were made on account of obligations of Mrs. Strauss. The Debtor cannot claim reasonably equivalent value for paying debt accumulated by another, or for love and affection. Consequently, the Debtor did not receive reasonably equivalent value in exchange for the payments to the [Bank]." The Trustee relies on the fact that during the two-year pre-petition period, while charges on Mrs. Strauss's account totaled $86,916, charges on Debtor's account totaled $34,605; thus, "Mrs. Strauss made 72.2 percent of the charges incurred by the couple in the two years prior to the petition date."

In response, the Bank states that there is no dispute that Mrs. Strauss is liable for the charges on her account, but so is the Debtor, because "an individual has a statutory and common law duty to support his or her spouse" and children. *Commonwealth of Pa., ex rel. Moore v. Barta*, 790 P.2d 895, 896 (Colo. App. 1993); *In re Marriage of Connerton*, 260 P.3d 62 (Colo. App. 2010) ("[B]oth parents have a duty to support their children."); Colo. Rev. Stat. § 14-6-101. The Bank also notes that the cases the Trustee cites, holding that "love and affection" does not qualify as reasonably equivalent value, are factually inapposite because the value provided here was not love and affection. It was the services and goods that the Debtor and his wife bought using their credit cards.

---

[5] As noted in the previous section, insolvency is presumed during the 90-day pre-petition period under § 547(f).

8

The Debtor and his spouse have three children. His wife, as a full-time homemaker, presumably takes care of their children. The Trustee argues that "nothing in the statute (Colo. Rev. Stat. 14-6-101) requires a bread winner spouse to support the lavish lifestyle of another spouse." (Trustee's Response, docket #31). The Court has reviewed the credit card statements for the two-year pre-petition period and cannot conclude that, in this case, the Debtor was supporting the "lavish lifestyle" of his spouse. While the Trustee argues that "a great many payments were made to accommodate a lavish lifestyle, including expenditures at extravagant restaurants, spas, ski resorts, and vacation destinations," the credit card statements do not support that assertion. The statements show consistent monthly charges, in the same general range, at stores like King Soopers, Wal-Mart, Target, TJ-Maxx, Payless Shoes, the Dollar Store and Hobby Lobby, as well as charges for public school fees, gymnastics, Girl Scouts, veterinary bills, landscaping supplies, car repair, cable service, medical bills, and a regular dental premium. For the majority of the applicable period, the charges on Mrs. Strauss's individual card ranged from approximately $4,000 to $5,000 per month, or less, which is not an extraordinary outlay for a family of five, given Debtor's income range as reflected in the couple's joint bank statements. (Submitted as exhibits to the Trustee's motion for summary judgment at docket #25). Debtor's charges on his individual card generally ranged from approximately $1,000 to $2,000 monthly, or less. His charges also include some basic household expenses (the Home Depot, car washes, pizza places), as well as some travel and restaurant expenses.

As for "lavish expenses," the charges at "Spa Palace" (a hot-tub supply store) actually appear on Debtor's individual credit card (docket #27, pages 10, 45, 76, 82, 95). The charges at ski areas on Mrs. Strauss's card appear to be for food (docket #27, pages 37, 38, 44, 101, 129). The ski pass was purchased on Debtor's individual credit card (docket #27, page 70).[6] The allegedly "extravagant" restaurants charged to Mrs. Strauss's account include Subway, Noodles and Company, Tokyo Joe's, McDonalds, and Jason's Deli. As far as "vacation destinations," Mrs. Strauss's account does reflect a family trip to Melbourne, Florida, in early 2010 (docket #27, page 9), but the statements for her account also show flights for the family to Newark, and hotel stays in Scranton, Pennsylvania. (Docket #27, pages 38, 63, 69 ). It would be a stretch to assume these were travels to "vacation destinations."[7] Additionally, the flights generally were partially paid for with the reward miles the couple earned on the credit cards.

Fraudulent intent usually is not an element to be resolved on summary judgment. However, at trial, the Trustee would need to show that the Debtor paid the credit card debt to the Bank in order to defraud his other creditors. The Trustee has not provided a scintilla of evidence of such intent. "A plaintiff 'cannot avoid summary judgment merely by presenting a scintilla of

---

[6] The couple's rental property in a ski area (Eagle) was administered as part of the bankruptcy estate (docket #51).

[7] There apparently was a trip to Mexico in connection with the trip to Florida, but the charges appearing on Mrs. Strauss's card equal those on Debtor's individual card for that trip. (Docket #27, page 10).

9

evidence to support her claim; she must proffer facts such that a reasonable jury could find in her favor.'" *Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1130 (10th Cir. 2009) (quoting *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009)). Further, a large body of case law supports the Bank's argument that a debtor's payment of household expenses to provide for his family is not fraudulent. *United States v. Goforth*, 465 F.3d 730, 737 (6th Cir. 2006) (monthly allowances wife received from her husband were used to pay living expenses such as food, clothing, utilities, gasoline, property taxes, and travel expenses)*; In re Ciotti*, 448 B.R. 694, 703 (Bankr. W.D. Pa. 2011) (" the Court views the payment of the sale proceeds to the Debtor's wife not as a transfer intended to delay, hinder or defraud creditors but rather as part of the Debtor's customary efforts to support his family with their ongoing living expenses."); *In re DiFabio*, 2004 WL 5250438 (Bankr. D. Conn.2004) (where it was debtor's practice to turn over earnings to wife for household expenses, such conduct, without more, does not amount to evidence of fraudulent intent); *In re Gugliada*, 20 B.R. 524 (Bankr.S.D.N.Y.1982) (debtor's customary transfer of his paychecks to wife, with allowance back to him, for living expenses rebutted any prescription of actual fraud).

The Trustee and the Bank also disagree whether Debtor received "reasonably equivalent value" in exchange for his payments to the Bank "on behalf of" his wife. Numerous cases hold that a debtor does receive "reasonably equivalent value" when he/she makes payments to his/her spouse (or co-habitant) that are used for household expenses. *See Gonzalez v. Wells Fargo Bank, N.A. (In re Gonzalez)*, 342 B.R. 165, 172–73 (Bankr.S.D.N.Y.2006); *Slone v. Brennan (In re Fisher)*, No. 03–33161, 2006 WL 1452498, at *7–8 (Bankr.S.D.Ohio Jan.20, 2006); *Schilling v. Montalvo (In re Montalvo)*, 333 B.R. 145, 150 (Bankr.W.D.Ky.2005). The Trustee cites *In re Kelsey*, 270 B.R. 776 (10th Cir. BAP 2001) for the proposition that "the care and comfort one receives from a marital relationship" does not qualify as reasonably equivalent value. In that case, however, the trustee pursued a fraudulent transfer claim against the non-debtor wife, where the debtor had withdrawn all the funds from a joint bank account and given some of them directly to his wife, who then redeposited them after he filed for bankruptcy. This transaction also differed from the normal course of the couple's dealings. The facts in *Kelsey* are different from those presented here. Additionally, in this case, the Trustee is attempting to recover the transfers made by the Debtor not from Mrs. Strauss, but from the Bank.

The parties further disagree as to whether Mrs. Strauss, or the Bank, is the "initial transferee" under these facts. The Trustee argues that he may "always recover a transfer from the initial transferee regardless of the good faith of the transferee." *Rupp v. Markgraf*, 95 F.3d 936, 938 (10th Cir. 1996). The Trustee states that "where an entity . . . does not maintain dominion or control over the property transferred, they are a mere conduit and not considered an initial transferee under § 550(a)." The Trustee contends that Mrs. Strauss is only a conduit because she never had dominion and control over the joint bank account since she did not earn the money that went into it, citing *In re Kobernusz*, 160 B.R. 844 (Bankr. D. Colo. 1993). Thus, concludes the Trustee, the Bank is the initial transferee and his motion for summary judgment should be granted.

In response, the Bank contends that Mrs. Strauss is the initial transferee, because, in Colorado, as soon as the funds were placed into the joint bank account, Mrs. Strauss had full control over the funds. *Estate of Westfall v. Westfall*, 942 P.2d 1227, 1230 (Colo. Ct. App. 1996). The Bank distinguishes *Kobernusz* because it concerned whether a creditor could garnish funds in a joint bank account when the husband's earnings were the only funds deposited in the account. The wife objected, citing a statute in the Probate Code. The court held that, even if the statute applied, the funds in the account did not belong to the wife, and the creditor could reach the funds. The court in that case did not say that the account holder who did not contribute to the joint account cannot make any disbursements from the account.

The Court agrees with the Bank. As soon as the funds were placed into the joint bank account, Mrs. Strauss had full control over the funds. "[E]ither party to a joint account has the legal right to deplete it." *Estate of Westfall*, 942 P.2d at 1230. "Funds held in an account, either in the single name of one of the parties or in their joint names, are equally a part of the marital estate." *Id.* "When a spouse places separate property in joint ownership during the marriage, a presumption that the donor spouse intended a gift to the marriage arises; the gifted property is presumed marital absent clear and convincing evidence to the contrary." *In re Marriage of Krejci*, 297 P.3d 1035, 1037 (Colo. App. 2013). Further, the Court agrees with the Bank that, as a matter of policy, the lending industry cannot be given the task of determining whether a husband and wife are segregating their money and paying their bills in accordance with a strict interpretation of state marital property laws.

The Court finds that the Trustee has not met his burden of proof under § 548. There is no evidence of insolvency in the two-year period, given Debtor's history of paying the Bank's bills in full each month. Even if the Trustee did prove insolvency, the Trustee's claim still fails as a matter of law. There is no evidence of Debtor's intent to defraud based on his payment of the family bills, which is an obligation imposed on him by state law. The Trustee's position ignores the reality of how a family unit may conduct its financial affairs. Further, there is no demonstration that Debtor received less than reasonably equivalent value for the transfers. Even a cursory review of the credit card statements at issue show that a large portion of the charges Mrs. Strauss incurred were obviously for the care of the children (food, clothing, schooling, children's activities, medical expenses, dental expenses). Debtor received reasonably equivalent value when his children were cared for. *See In re Montalvo*, 333 B.R. at 150 ("Debtor, of course, received a direct benefit from the transfers because the funds were used to pay his ordinary and necessary living expenses and that of his family. The transfers also satisfied his legal obligation to his dependents"). For all of these reasons, the Court grants summary judgment to the Bank on the Trustee's third and fourth claims for relief.

C) Fifth Claim for Relief (Disallowance under § 502).

11 U.S.C. §502(d) provides:. . . [T]he court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a

transferee of a transfer avoidable under section -6- 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(I), 542, 543, 550, or 553 of this title." Because the Court has found that the transfers at issue are not recoverable or avoidable by the Trustee, this claim is moot.

III. Conclusion

For the foregoing reasons, the Trustee's Motion for Summary Judgment (docket #25) is DENIED, and the Bank's Motion for Summary Judgment (docket #26) is GRANTED. The Trustee's complaint against the Bank is DISMISSED and judgment shall enter for the Bank.

Dated this 16th day of March, 2015.

BY THE COURT:

*Howard Tallman*

Howard R. Tallman, Judge
United States Bankruptcy Court